UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

APRIL FARMER                                    CIVIL ACTION

VERSUS                                          NO. 16-16459

CECILIA MOUTON ET AL.                           MAGISTRATE JUDGE
                                                JOSEPH C. WILKINSON, JR.

## ORDER AND REASONS ON MOTION

This is an employment discrimination action brought by plaintiff, April Farmer

("Farmer"), against her former employer, the Louisiana State Board of Medical Examiners (the

"Board"), and the Board's Executive Director and Director of Investigations, Dr. Cecilia Mouton

("Mouton"), in her individual and official capacities. Farmer asserts claims of race

discrimination, hostile work environment, constructive discharge and retaliation in violation of

Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983.[1]  She seeks compensatory and

punitive damages and injunctive relief.  Complaint, Record Doc. No. 1.  This matter was referred

to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with

28 U.S.C. § 636(c) upon written consent of all parties.  Record Doc. No. 20.

Defendants filed a timely motion for summary judgment, supported by an affidavit,

verified documents and deposition excerpts.  Record Doc. No. 42.  The motion seeks dismissal

of all of plaintiff's remaining claims on several grounds.  Farmer filed a timely opposition

memorandum, Record Doc. No. 49, with supporting exhibits.  Plaintiff asserts that genuine

---

[1]The court previously dismissed plaintiff's claims of race discrimination, hostile work environment, constructive discharge and retaliation under the Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:301 et seq.; reprisal for whistle-blowing activity in violation of the Louisiana Whistleblower Statute, La. Rev. Stat. 23:967; and intentional infliction of emotional distress under Louisiana state law.  Record Doc. No. 30.

issues of material fact exist as to each of her claims. Record Doc. No. 49 at pp. 18, 19 and 23-25.

Having considered the complaint, the record, the arguments of the parties and the applicable law, IT IS ORDERED that defendants' motion for summary judgment is **GRANTED** for the following reasons.

I.    THE UNDISPUTED FACTS

The following material facts are accepted as undisputed solely for purposes of the pending motion for summary judgment. The facts are drawn from the parties' statements of fact and exhibits, especially Farmer's and Mouton's deposition testimony and the sworn affidavit in the record.

Farmer began working at the Board in December 2007 as a Licensing Analyst 1. Record Doc. Nos. 42-14 at ¶ 1 and 49-11 at ¶ 42. She was promoted to the position of Licensing Analyst 2 in November 2008 and retained that job title when she was laterally transferred to a position in the Board's accounting department in August 2012. Id. 42-14 at ¶¶ 2-3 and 49-11 at ¶ 48.

Farmer testified that she applied through Civil Service, which is a separate entity from the Board, for three compliance investigator positions, which opened in 2013. Id. 42-14 at ¶ 15 and 49-11 at ¶¶ 49-50. She testified that three women were hired into those open investigator positions. Record Doc. No. 49-1 at p. 9 (Farmer's deposition p. 31, lines 23-24). Farmer is an African American woman; the three women who were hired, Leslie Rye, Cathy Storm and Virginia Madere, are Caucasian women. Record Doc. No. 49-11 at ¶¶ 43 and 51.

Rye was hired by the Board in August 2009. Record Doc. No. 42-3 at ¶ 2. Rye is a registered nurse. Record Doc. No. 42-14 at ¶ 6. Storm transferred to the Board from another state agency in March 2013. Record Doc. No. 42-3 at ¶ 4. Storm is also a registered nurse. Record Doc. No. 42-14 at ¶ 11. The Board hired Madere for the position of Compliance Investigator 2 in June 2014. Record Doc. No. 42-3 at ¶ 6. Farmer testified that she received an email from Civil Service stating that she was not qualified for the position that Madere was hired to fill. Record Doc. No. 49-1 at p. 10 (deposition p. 35, lines 14-15). Plaintiff contends that she did not receive any direct communication from Civil Service concerning her qualification for Rye's or Storm's positions, but that she was told by a Board employee that she did not qualify for those positions. Id. at deposition p. 34, lines 5-9. She testified that she did not send an appeal to Civil Service concerning its hiring decisions. Id. at deposition p. 36, lines 11-14.

A Compliance Investigator 2 "[c]onducts investigations on violations regarding Board/Agency policies, state and federal statutes, Civil Service rules, licensure and/or ethics." Record Doc. Nos. 49-4 at p. 17 and 49-11 at ¶ 12. Civil Service's listed minimum qualification requirements for the position of Compliance Investigator 2 include a baccalaureate degree plus one year of professional experience in the following: accounting or financial auditing; program auditing; building inspection; administrative services; internal affairs investigation; investigatory work; law enforcement; legal research; real estate investigation; real estate appraisal; or in the issuance or recommendation of the issuance of medical related licenses. Id. 49-4 at p. 18 and 49-11 at ¶¶ 12-13. Six years of work experience or a combination of work experience and college credit could be substituted for the baccalaureate degree requirement. Id. 49-4 at p. 19.

Farmer's educational background consists of two degrees in criminal justice – one a bachelor of science and the other an associate degree – and a paralegal certificate. Record Doc. Nos. 49-1 at p. 15 (deposition p. 57, lines 7-10) and 49-11 at ¶¶ 44 and 56. Plaintiff admitted in her deposition testimony that she did not believe that she was more qualified for the compliance investigator position than Storm or Rye, but she felt that she met the minimum requirements. Record Doc. No. 49-1 at p. 11 (deposition p. 38, lines 13-17). Farmer testified, however, that she believes she was more qualified than Madere due to her legal background. Id. at deposition p. 39, lines 12-21. Plaintiff testified that she does not have any knowledge of how the Civil Service hiring process works. Id. at deposition p. 41, lines 9-11. In her sworn affidavit, Cynthia Knecht, the Board's Human Resources Specialist, testified that Farmer's name was not included on the list of eligible applicants provided by Civil Service to the Board for the position of Compliance Investigator 2. Record Doc. No. 42-3 at ¶ 6. As a result, Knecht stated, the Board could not have hired Farmer as a Compliance Investigator 2. Id.

Mouton testified in her deposition that when she became director in 2013 she looked into "shuffl[ing]" the Board's accounting department, which would have resulted in Farmer getting a new position with more duties and a higher salary. Record Doc. No. 42-4 at pp. 9-10. Mouton testified that she was told by Farmer's supervisor that such a "shuffle" was not possible. Id. at p. 10. Plaintiff testified that she responded to a survey, "in a nutshell," that she did not feel she "was being utilized to [her] full capabilities." Record Doc. No. 49-1 at p.14 (deposition p. 53, lines 7-9). Farmer also testified that she did not have enough work to do as a licensing analyst and that she was given additional job duties, including occasional delivery and janitorial work, after taking the survey. Id. at pp. 18-19 (deposition pp. 69-70).

Plaintiff testified that she was employed as a paralegal for Jordan's Legal Solutions while she was simultaneously working at the Board; she admitted that she would do this paralegal work without permission during Board business hours. Id. at pp. 4-5 (deposition pp. 13-14). Mouton testified that the Board had evidence that Farmer was using Board equipment to do her work for the outside paralegal business. Record Doc. No. 42-4 at pp. 4-5. As a result, Mouton testified that she asked the Board's head of information technologies to search Farmer's computer, which revealed "numerous examples of documents that [Farmer] was working on during business hours, [and] e-mails to business associates of hers, that were not related to the [Board]." Id. at p. 8. Mouton testified that she asked Farmer's supervisor to counsel Farmer against her inappropriate use of the Board's resources, but Mouton denied that she ever sought to fire Farmer for her actions. Id. at pp. 3 and 5.

Farmer testified that she began "aggressively looking for another job" in mid June 2014 after she received the email from Civil Service stating that she was not qualified for the Compliance Investigator 2 position. Record Doc. No. 49-1 at pp. 12 and 20 (deposition pp. 44, lines 12-14 and 74, lines 16-19).

On July 8, 2014, Farmer emailed her supervisors to request a leave of absence from work so that she could explore other employment options. Record Doc. Nos. 42-5 at p. 1 and 42-14 at ¶ 21. Plaintiff wrote a letter to the Equal Employment Opportunity Commission (the "EEOC") the next day, July 9, 2014, and stated that she believed she was "experiencing racial discrimination and harassment in the workplace." Record Doc. Nos. 49-6 and 49-11 at ¶ 33. Mouton then received a letter from paralegal Sonjanita Jordan, the owner of plaintiff's other employer, Jordan's Legal Solutions, sent on July 10, 2014, which alleged that the Board had

potentially violated Title VII by harassing and discriminating against plaintiff on the basis of her race. Record Doc. Nos. 42-4 at p. 11, 42-8 and 49-1 at p. 46.

Farmer submitted her resignation letter to the Board eight (8) days later, on July 18, 2014. Record Doc. Nos. 42-1 at p. 10, 42-14 at ¶ 28 and 49-1 at pp. 47-48. Mouton accepted Farmer's resignation the same day. Id. Farmer testified that she had accepted a job as a paralegal at the Jefferson Parish Attorney's Office "days before" she submitted her letter of resignation and that she began her new job on August 4, 2014. Record Doc. No. 49-1 at pp. 24 and 27 (deposition pp. 91, line 6 and 105, lines 20-21). Farmer's last day of work at the Board was July 25, 2014. Record Doc. No. 42-1 at p. 10. She submitted a charge of discrimination to the EEOC on August 28, 2014, alleging discrimination based on race and color and retaliation beginning on July 15, 2014. Record Doc. No. 42-13.

II.    ANALYSIS

A.    Standards of Review

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.

(4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements

of its claim. Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs.,

L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011). "[A] complete failure of proof concerning an

essential element of the nonmoving party's case renders all other facts immaterial." Celotex, 477

U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but

only if both parties have introduced evidence showing that an actual controversy exists."

Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405

F.3d 278, 284 (5th Cir. 2005). "We do not, however, in the absence of any proof, assume that

the nonmoving party could or would prove the necessary facts." Badon v. R J R Nabisco Inc.,

224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original). "Conclusory

allegations unsupported by specific facts . . . will not prevent the award of summary judgment;

'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant

probative evidence tending to support the complaint."'" Nat'l Ass'n of Gov't Employees, 40

F.3d at 713 (quoting Anderson, 477 U.S. at 249) (emphasis added).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary

judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential

fact that it could not support a judgment in favor of the nonmovant." Little v. Liquid Air Corp.,

37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v.

Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

Under Fed. R. Civ. P. 56(c)(1)(A), evidence submitted at the summary judgment stage must be admissible as presented or the proponent must show that it will be presented in an admissible form as the proceedings continue.

> Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial.
> [T]he rule expressly contemplates that affidavits are only one way to "support" a fact; "documents . . . declarations, [and] other materials" are also supportive of facts. Fed. R. Civ. P. 56(c)(1)(A). To avoid the use of materials that lack authenticity or violate other evidentiary rules, the new rule allows a party to object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible as evidence." Fed. R. Civ. P. 56(c)(2); see also advisory committee's note to 2010 amendment ("The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

Lee v. Offshore Logistical & Transp., L.L.C., 859 F.3d 353, 354-55 (5th Cir. 2017) (quotations and additional citations omitted); see also Maurer v. Indep. Town, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").

B.      Title VII Racially Discriminatory Failure to Promote

Farmer claims that she was denied promotions based on her race on three occasions when the Board placed three white women in those jobs in preference to her. Defendants argue that Farmer's claims under Title VII against the Board and Mouton for race discrimination should be dismissed because Farmer was not qualified by Civil Service for the positions. Defendants assert that plaintiff therefore fails to state a prima facie case of race discrimination based on the three failures to promote; that the Civil Service determination that she was not qualified

precluded them from considering her and constituted their legitimate non-discriminatory reason for not promoting her; and that plaintiff "presents no direct evidence of racial discrimination." Record Doc. No. 42-1 at pp. 12-14. Plaintiff responds that "Mouton could never truly reveal why April [Farmer] was not made a Compliance Investigator except for the color of her skin." Record Doc. No. 49 at p. 23.

Title VII makes it unlawful for an employer to discriminate against an employee "because of such individual's race" or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race." 42 U.S.C. § 2000e-2(a). Plaintiff's Title VII discrimination claims based on circumstantial evidence are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Plaintiff has the initial burden of proving a prima facie case of race discrimination. Id.

> In a failure-to-promote claim under Title VII, a plaintiff may establish a prima facie case of discrimination by showing that (1) [s]he was within a protected class; (2) [s]he was qualified for the position sought; (3) [s]he was not promoted; and (4) the position [s]he sought was filled by someone outside the protected class.

Smith v. Womans Hosp., 671 F. App'x 884, 888 (5th Cir. 2016) (citing Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001)) (emphasis added).

A presumption of discrimination arises if plaintiff successfully establishes her prima facie case. Id. at 887. The employer must then

> rebut [the] presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action. If the employer meets its burden, then it shifts back to the plaintiff to present substantial evidence that the employer's reason was a pretext for discrimination. If the plaintiff can

show that the proffered explanation is merely pretextual, that showing, when coupled with the prima facie case, will usually be sufficient to survive summary judgment.

Id.

Plaintiff's subjective belief of discrimination, however genuine, cannot be the basis of relief. Carr v. Sanderson Farms, Inc., 665 F. App'x 335, 338 (5th Cir. 2016); Nichols v. Lewis Grocer, 138 F.3d 563, 570 (5th Cir. 1998) (citing Little, 924 F.2d at 96).

At the summary judgment stage, "'the plaintiff must substantiate [her] claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision. . . . [T]he only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination.'" Wilson v. Exxon Mobil Corp., 575 F. App'x 309, 313 (5th Cir. 2014) (quoting Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002); Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 (5th Cir. 1999)). "If the plaintiff can show the employer's asserted justification is false, this showing, coupled with a prima facie case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff without additional evidence." Price, 283 F.3d at 720 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

"The plaintiff's 'ultimate burden' is to 'persuad[e] the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Turner v. Kan. City S. Ry., 675 F.3d 887, 900 (5th Cir. 2012) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

[A]n employment discrimination case under Title VII based on . . . racial discrimination . . . proceeds as does virtually any civil trial, with the plaintiff being required to prove the elements of h[er] case by a preponderance of the evidence–here that (1) [s]he is a member of a protected class, (2) an adverse

employment action was taken against h[er] which favored a member of a non-protected class or a less qualified member of the protected class, and (3) racial animus was a motivating factor of the adverse employment action taken.

Gallaspy v. Raytheon Tech. Servs. Co., 211 F. App'x 269, 270 (5th Cir. 2006) (emphasis added).

(i)     The Two Positions Requiring Nursing Licenses

Farmer's failure to promote claims must be dismissed in part because she fails to sustain her initial burden of establishing that she was qualified as to the positions for which Rye and Storm were selected. There is no dispute that Farmer, an African American female, is a member of a protected class who was not promoted. She testified that she applied through Civil Service for the position of compliance investigator on three separate occasions, and that Leslie Rye, Cathy Storm and Virginia Madere, all Caucasian, were hired as compliance investigators on those occasions. Record Doc. Nos. 49-1 at p. 9 (Farmer's deposition p. 31, lines 21-24) and 49-11 at ¶ 51. The evidence establishes that Farmer was not qualified for the positions filled by Rye and Storm. Record Doc. No. 49-1 at pp. 9-10 (deposition pp. 31-37).

All three positions, including these two, were subject to the sometimes arcane requirements of the Louisiana state employee Civil Service system. Farmer admitted in her deposition testimony that she has no knowledge of how the Civil Service hiring process works. Id. at p. 11 (deposition at p. 41, lines 9-11). Therefore, the testimony of Mouton and the affidavit of Knecht, the Board's human resources specialist, concerning the Civil Service qualifications requirements for the subject positions are undisputed. Mouton testified that the process by which the Board fills positions begins with "whether civil service deemed her eligible for that position, and then whether she met the Board's requirements for that position." Record

Doc. No. 49-3 at p. 37 (Mouton's deposition at p. 142, lines 11-14) (emphasis added). Mouton testified:

> I don't establish qualifications. It's done through civil service. So [Farmer] would have to go and apply for a position that was posted by the agency, <u>civil service would verify her minimum qualifications</u>, and the agency can add additional qualifications . . . [P]eople go online to the civil service – we post a job. You go online. You submit an application. <u>Civil service</u> then turns over a list of qualified applicants. And from that list, then civil service vets it and they send it to us.
> . . .
> [Farmer] may have gone to the civil service website and submitted an application. But if she didn't meet minimal qualifications, she wouldn't have been turned over to us to interview. So we only see the people that get screened out after civil service.
> . . .
>  [E]very position that we create and every person that we hire is done in accordance with civil service rules and guidelines. Civil service approves every position . . . . Civil service has to decide whether we've got the right person in the right position.

<u>Id.</u> at pp. 47 (deposition at p. 184, lines 7-18), 48 (deposition at p. 188, lines 3-9) and 55 (deposition at p. 216, lines 13-18) (emphasis added).

Knecht's affidavit establishes that Farmer was deemed ineligible by Civil Service review for the positions for which Rye or Storm were selected, both of which required nursing experience. Farmer did not recall receiving direct communication from Civil Service concerning her qualifications for Rye's and Storm's positions, but was told by Human Resources specialist Knecht that she was not qualified. Record Doc. No. 49-1 at p.10 (deposition pp. 34-35).

Farmer has failed to produce competent summary judgment evidence to raise a material fact issue as to the second prong of her prima facie case of race discrimination that she was qualified for the positions filled by Rye and Storm. Her conclusory and unsubstantiated

- 13 -

allegations that she was qualified for these two positions, both of which required a nursing license that she lacked, is inadequate to satisfy the nonmovant's burden on summary judgment. Henry v. Cont'l Airlines, 415 F. App'x 537, 540 (5th Cir. 2011) (quoting Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429-30 (5th Cir. 1996)).

Thus, Farmer cannot establish a prima facie case of race discrimination based on failure-to-promote for the positions filled by Rye and Storm because there is no material fact dispute that she was not qualified for the subject positions of RN-Nurse Practice Consultant and RN Compliance Officer. Although Knecht's affidavit states that Farmer did not apply for Rye's or Storm's positions, while Farmer testified that she did apply, this fact dispute is immaterial because Farmer was not qualified per Civil Service requirements for those positions. Mouton testified without genuine dispute that "[w]e hired Cathy Storm as a nurse practice consultant because that was the most appropriate civil service title for her." Record Doc. No. 49-3 at p. 48 (deposition at p. 188, lines 18-21). Similarly, Rye was a nurse practice consultant. Id. at p. 53 (deposition p. 209, lines 2-3); Record Doc. No. 42-3 (Knecht affidavit at ¶2).

Knecht testified that one of Civil Service's minimum requirements for an RN-Nurse Practice Consultant, Rye's position, and an RN Compliance Officer, Storm's position, is possession of a valid Louisiana license or temporary permit to practice professional nursing plus a certain number of years of professional nursing experience. Record Doc. No. 42-3 at ¶¶ 2 and 4. Rye and Storm are registered nurses. Record Doc. No. 42-14 at ¶¶ 6 and 11. Farmer is not a registered nurse, and she admitted in her deposition testimony that she was not more

qualified than Rye or Storm. Record Doc. No. 49-1 p. 11 (deposition at p. 38, lines 8-22). Farmer was not qualified per Civil Service requirements for either Rye's or Storm's positions.

On this record, plaintiff has failed to sustain her burden to produce evidence sufficient to establish a prima facie case of race discrimination in defendant's failure to promote her to the positions filled by Rye and Storm. Accordingly, defendants are entitled to summary judgment as a matter of law, and plaintiff's racially discriminatory failure to promote claims concerning Rye's and Storm's positions must be dismissed with prejudice.

(ii)    Madere's Compliance Investigator 2 Position

Although it presents a closer, more complex evidentiary evaluation, Farmer's remaining racially discriminatory failure to promote claim must also be dismissed because she fails to sustain her burden of establishing that defendants' legitimate non-discriminatory reason for not promoting Farmer to the position filled by Madere was merely pretext for discrimination.

Plaintiff testified that she received an email directly from Civil Service stating that she was not qualified per Civil Service requirements for the compliance investigator position filled by Madere. Record Doc. No. 49-1 at p. 10 (deposition p. 35, lines 14-15). The email, dated May 15, 2014, states:

> According to the information in your application, you do not meet the minimum qualification requirements for the COMPLIANCE INVESTIGATOR job title. You may review the qualification requirements by visiting the Job Specifications page in LA Careers. If you have any questions regarding this decision you may contact me at christopher.dunuv@la.gov.

Id. at p. 38 (Exhibit 4). Per the undisputed statements in Knecht's affidavit and Mouton's deposition testimony, the Board could not have hired Farmer for the position filled by Madere

- 15 -

because plaintiff's name was not on the list of "eligible applicants for the position" provided to the Board by Civil Service, and plaintiff has produced no competent evidence to contradict that evidence. Record Doc. No. 42-3 at ¶ 6. Farmer's subjective belief that she was <u>more</u> qualified than Madere based on her "legal background" is purely speculative and not sufficient to create a triable issue of fact as to this claim. Record Doc. No. 49-1 at p. 11 (deposition pp. 38-39). However, there is sufficient evidence in the record to create a material fact issue that Farmer was in fact qualified at the prima facie case level of evaluation for the Compliance Investigator 2 position.

The minimum qualifications for the position of Compliance Investigator 2, according to Civil Service's published criteria, are "[a] baccalaureate degree plus one year of professional level experience in . . . legal research; . . . or in the issuance . . . of medical related licenses." Record Doc. No. 49-4 at p. 18. Farmer received a paralegal studies certificate from Tulane University in May 2013. Record Doc. No. 49-2 at p. 2. Farmer testified that she began working for Jordan's Legal Solutions in 2012 or 2013 as a contract paralegal while she was still in school at Tulane. Record Doc. No. 49-1 at p. 4 (deposition p. 12, lines 16-24). Even assuming that Farmer began working as a paralegal in 2013 at the latest, she would have had at least one year of "professional level experience" in legal research as a paralegal at the time she applied for the open position in May-June 2014.

Farmer also had at least one year of "professional level experience" in the issuance of medical related licenses as a Licensing Analyst 2. She was promoted to the position of Licensing Analyst 2 in November 2008 and retained that job title for the remainder of her career

at the Board.  Record Doc. Nos. 42-14 at ¶¶ 2-3 and 49-11 at ¶ 48.  In that position, Farmer "ensure[d] that medical related licenses [we]re timely issued to all eligible and qualified persons regulated by a statewide regulatory Board."  Record Doc. No. 49-4 at p. 7.

Farmer has produced competent summary judgment evidence to raise a material fact issue as to the second prong of her prima facie case of race discrimination that she was qualified for the position of Compliance Investigator 2.  Thus, the burden shifts to defendants to articulate a legitimate non-discriminatory reason for their failure to promote Farmer.  Smith, 671 F. App'x at 887.

"Defendant's burden is one of production, not persuasion,"  Reeves, 530 U.S. at 142 (quotation omitted), and it "involv[es] no credibility assessments."  Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000).  "While the defendant is not required to 'persuade the court that it was actually motivated by the proffered reasons,' in order to satisfy its burden, 'the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [its decision].'"  Turner, 675 F.3d at 900 (quoting Burdine, 450 U.S. at 254-55).  Defendants' reason for the adverse employment action does not need to be a proper or correct one, but it must be a legitimate, non-discriminatory one for defendants to satisfy their burden.  Clark v. Boyd Tunica, Inc., 665 F. App'x 367, 372 (5th Cir. 2016) (citing Bryant v. Compass Grp. USA Inc., 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.")).

Defendants' evidence establishes without dispute that without Civil Service's certification of Farmer's eligibility, the Board "could not have hired Farmer for the Compliance Investigator

2 position had it wanted to." Record Doc. No. 42-1 at p. 13. Knecht confirmed in her affidavit that Civil Service "did not include April Farmer's name on the list of eligible applicants for the position provided to [the Board]. Therefore, [the Board] could not have hired April Farmer for the position." Record Doc. No. 42-3 at ¶ 6. Even if, as Farmer's evidence indicates, Civil Service made a mistaken determination that Farmer was not qualified for the Compliance Investigator 2 position, defendants have produced a legitimate non-discriminatory reason for failing to promote Farmer based on their non-discretionary reliance on Civil Service's separate determination that Farmer was not an eligible candidate.

> "[M]erely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent."
> . . . .
> "[W]e do not view the discrimination laws as vehicles for judicial second-guessing of business decisions." That [defendants'] choices were arguably wrong or poorly executed does not change our analysis "so long as those decisions are not the result of discrimination."

Assariathu v. Lone Star Health Mgmt Assocs., L.P., 516 F. App'x 315, 321 (5th Cir. 2013) (quoting Jackson v. Watkins, 619 F.3d 463, 468 n.5 (5th Cir. 2010); Walton v. Bisco Indus., Inc., 119 F.3d 368, 372 (5th Cir. 1997); Bienkowski v. Am. Airlines, 851 F.2d 1503, 1508 n.6 (5th Cir. 1988)). Since defendants have met their burden of articulating a legitimate non-discriminatory reason for not promoting plaintiff, the burden shifts back to plaintiff to produce evidence that defendants' proffered reason is a pretext for discrimination. Smith, 671 F. App'x at 887.

Farmer admitted in her deposition testimony that she has no knowledge of how the Civil Service hiring process works. Her subjective belief that certain white employees were not hired

through the normal Civil Service process, Record Doc. No. 49-1 at p. 11 (deposition p. 41, lines 17-25), is not based on any personal knowledge and is not admissible. Fed. R. Evid. 602; Henry, 415 F. App'x at 540; Nichols, 138 F.3d at 570. Similarly, her testimony based on office talk that "they were not going to ever take me into the investigations department because of the color of my skin," is mere conclusion and speculation unsupported by specific facts. Plaintiff testified that she was told this by "several people who worked at the medical board," none of whom, however, were privy to Civil Service requirements or the Board's hiring decisions. Such supposedly "common knowledge" office chatter is inadmissible hearsay because the persons named by Farmer were not involved in the Board's hiring process and had no personal knowledge as to the basis of the Board's decision not to promote Farmer. Evans v. McClain of Ga., Inc., 131 F.3d 957, 962 (11th Cir. 1997) (employee's assertions, based on gossip, "common knowledge" and hearsay statements that employer gave white employees preferential treatment were not competent evidence of discriminatory motive with respect to employee's claims of failure to promote or discriminatory discharge under Title VII).

The principal admissible evidence of possible pretext presented by Farmer is one comment that Knecht reportedly made during an alleged discussion with Mouton. Farmer testified that after she received the May 15, 2014 email from Civil Service telling her that she was not qualified, Record Doc. No. 49-1 at p. 38 (Exhibit 4), she spoke with Knecht about her belief that she was qualified for the Compliance Investigator 2 position that Madere received. Id. at p. 10 (deposition p. 36, lines 9-16). Farmer stated that Knecht told her she would speak with Mouton, but Farmer said Knecht never did. Id., lines 17-21. After meeting with Knecht,

Farmer resubmitted her resume and transcripts to Knecht, not Civil Service.  Id. at p. 11

(deposition p. 41, lines 3-8).  Farmer testified that sometime "at the beginning" of June 2014,

in connection with her application for the Compliance Investigator 2 position:

> When I gave Cyndi Knecht my transcripts from SUNO and Tulane, she looked
> at my transcript.  She said she had discussed them with Dr. Mouton, and they
> were trying to figure out how was it that I was a single black mother and I went
> to Tulane, and I stayed on the honor roll and the president's list.  And Cyndi
> Knecht went as far as to say, I must have cheated.
> . . .
> I was trying to follow up to see like what had her and Dr. Mouton decided.
> Would there be, you know, a spot open for me.  Did I – should I wait a little bit
> longer?  Should I move on?  I was just trying to figure out what my next moves
> should have been.
> Up until this point, I pretty much trusted these people.  I did, you know, what they
> asked me to do.  I was confident that my time was going to come, and my time
> never came.
> . . .
> Cyndi Knecht said . . . directly to me [that I must have cheated].
> . . .
> She – after her and Dr. Mouton spoke, she said I must have.  She told me straight
> to my face, I must have cheated.
> . . .
> I can tell you I wasn't happy about [that comment].  I had some words to say.  But
> at that point in time, I went back to my office and I started sending out my
> resume.

Id. at p. 12 (deposition pp. 44, lines 17-25 and 45, lines 1-25) (emphasis added).

Although Farmer's recitation of what Knecht said to her and what Knecht and Mouton

said to each other is hearsay, at the threshold level of evidentiary evaluation, it is nevertheless

admissible.   An opposing party's statement is admissible when offered against the opposing

party if it "was made by the party's agent or employee on a matter in the scope of that

relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D); see Magiera v. City of Dallas,

389 F. App'x 433, 439 (5th Cir. 2010) (discussion between two lieutenants, in the course of their

employment while specifically tasked with assigning eligible officers to particular shifts regarding why plaintiff was prohibited from training, was found to be "'a matter within the course of their agency or employment,' rather than mere water-cooler gossip").

This kind of statement by Knecht, which was also attributed to Mouton, is evidence of racial animus, particularly when coupled with the fact that the Civil Service job description itself appears to indicate that Farmer was qualified for the Compliance Investigator 2 position. While Knecht and Mouton may have exhibited racial animus in the aforementioned exchange, neither Knecht nor Mouton were decision makers in the Civil Service qualification determination that was a prerequisite before defendants could consider and ultimately decide who would be promoted. "[S]tatements by non[-]decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden of showing discriminatory intent." Lavigne v. Cajun Deep Founds., L.L.C., 654 F. App'x 640, 646-47 (5th Cir. 2016), cert denied, 137 S. Ct. 1328 (2017) (quotation omitted) (citing Rios v. Rossotti, 252 F.3d 375, 382 (5th Cir. 2001)).

There is no evidence that Knecht or Mouton had any contact with Civil Service before Civil Service's eligibility determinations such that they influenced the decision in any way in which a cat's paw analysis would apply. See Roberson v. Alltel Info. Servs., 373 F.3d 647, 653 (5th Cir. 2004) (quotation omitted) ("To invoke the cat's paw analysis, [a plaintiff] must submit evidence sufficient to establish two conditions: (1) that a coworker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker."). Mouton testified that Knecht emailed Civil Service in January 2015, long

after the promotion process concluded, because Knecht "was maybe trying to confirm whether or not [Farmer]" was "passed over" for the Compliance Investigator 2 position in May-June 2014. Record Doc. No. 49-3 at p. 55 (deposition p. 214, lines 11-14). Mouton further testified that she did not recall asking Civil Service any questions about Farmer in 2014. Id. at p. 57 (deposition p. 224, lines 5-11). This is the only evidence of possible interaction between Knecht and Civil Service and/or Mouton and Civil Service either before or after Civil Service determined that Farmer was ineligible for the Compliance Investigator 2 position and is wholly insufficient to create a material fact issue that either one influenced the Civil Service decision.

Plaintiff has failed to sustain her burden to produce evidence sufficient to establish that defendants' proffered legitimate, non-discriminatory reason for not promoting her to the position filled by Madere is mere pretext for racial discrimination. Accordingly, defendants are entitled to summary judgment on all of plaintiff's race discrimination claims under Title VII as a matter of law.

C.    Remaining Title VII Claims

The sum total of the remaining evidence concerning racial animus and her harassment, hostile work environment, constructive discharge and retaliation claims submitted by plaintiff can be found in her own deposition. Plaintiff testified that before Mouton's promotion to Executive Director in June 2013, Mouton had not taken any actions against her that she believed were racially motivated. Record Doc. No. 49-1 at p. 9 (deposition p. 30, lines 1-7). Asked whether particular previous instances of alleged harassment, which are unrelated to the present action, by employees other than Mouton were racially motivated, Farmer responded that they

were not.  Id. at pp. 6, 8, 10 (deposition pp. 21, 26 and 35).  Farmer testified that the first instance of harassment by Mouton occurred when several positions opened in the investigations department at the end of 2013.  Id. at p. 9 (deposition p. 30, lines 16-21).  "When I inquired about those positions," plaintiff testified, "[Mouton] became agitated and aggravated with me and would blow me off.  She would get very short with me, tell me not to talk to her, to talk to Grace [Hammons]. . . . She would even try to discourage me from working in the investigations department."  Id. at deposition pp. 30, lines 21-25 and 31, lines 1-3.

Farmer stated that she tried to speak with Mouton on several occasions after she was told that she was not qualified for the three positions for which Rye, Storm and Madere were hired.  Id. at p. 13 (deposition p. 46, lines 16-21).  It was at this point, Farmer stated, that she "came to the realization it was time for me to go, but things got really intense.  They got really heated. . . . Racially, there was a lot of racial tension."  Id., lines 22-25.  Plaintiff testified that Board employees worked apart, with African Americans working almost exclusively on the third and fourth floor.  Id. at deposition p. 47, lines 1-7.

Farmer testified that she was told by David Aucoin, a contract accountant for the Board, that Mouton felt that Farmer was bored based on her responses to a work survey.  Id. at p. 15 (deposition p. 54, lines 10-15).  She also testified that Mouton gave her and other employees in the Board's accounting department extra work to do because Mouton believed that they did not have enough work.  Id. at p. 18 (deposition p. 69, lines 6-25).  Plaintiff wrote an email to her supervisors – Gayle Jones, Michelle Parker and David Aucoin – on July 8, 2014.  Id. at p. 14 (deposition pp. 51, lines 2-25 and 52, lines 1-4).  She testified that she did not mention racial

discrimination or harassment in that email because "[i]t had already been addressed in conversations with [her] supervisor." Id. at p. 17 (deposition p. 63, lines 1-2). Farmer testified that she spoke with Jones on a previous occasion, after she received the email from Civil Service concerning her lack of qualifications for the Compliance Investigator 2 position, about racial discrimination and harassment. Id., lines 7-9. Plaintiff stated that she sent a letter to the EEOC on July 9, 2014, alleging racial discrimination and harassment, and that this letter was her first contact with the EEOC. Id. at deposition p. 62, lines 4-19. She testified that she heard from co-workers at the Board that Mouton and Knecht received this EEOC letter by July 14, 2014. Id. at p. 24 (deposition p. 93, lines 1-20).

Farmer testified that approximately one year before making complaints to her supervisors and the EEOC, she was told by "several people who worked at the medical board," including Gayle Jones, Michelle Parker, Sandra Broussard, Merian Glasper and Vanissa Prout, that she "would never be accepted into the investigations department because of the color of [her] skin." Id. at p. 17 (deposition p. 63, lines 11-17). She further testified that "[a]lmost everybody in the medical board knew that they were not going to ever take me into the investigations department because of the color of my skin. . . . I was having these conversations with Dr. Mouton. I thought . . . that a woman . . . in her position . . . would have at a minimum been at least honest with me, but she was not." Id. at deposition pp. 63, lines 19-25 and 64, lines 1-2. When asked whether she submitted anything in writing, before July 9, 2014, to anyone at the Board stating that she believed she was subjected to racial discrimination or harassment, Farmer answered

"[n]ot in writing."  Id. at p. 64, lines 13-17.  Plaintiff stated she had conversations with her supervisors about those issues.  Id., lines 18-21.

Farmer testified that her other employer, paralegal Sonjanita Jordan, sent a letter to Mouton alleging possible Title VII violations on July 10, that she submitted her resignation letter eight days later on July 18 and that she was "forced out on or about July 24 or 25."  Id. at p. 20 (deposition p. 74, lines 4-9).  Asked whether she had any issues with Mouton from July 10 to July 18, 2014, plaintiff responded that Mouton made her leave her door open and her lights on, that her office was ransacked and that her IP address was changed so that Mouton could monitor her computer usage.  Id. at deposition pp. 74-76.  She alleged that during that eight-day period, she was "black-balled by several large firms.  Well, by Dr. Mouton.  People would not hire me . . . because everybody knew about the situation with Dr. Mouton."  Id. at deposition p. 77, lines 2-5.

> Finally, plaintiff testified that she was
>
> looking for other employment because of the way that [she] had been treated by Dr. Mouton.  [She] was looking for other employment because Dr. Mouton was racially discriminating against me and was not going to ever promote me or move me to the investigations department.  And I knew this at this point in time, because I had been overlooked several times.  She just was not entertaining–no matter how good I was, no matter how educated I was, no matter what I did or did not do, she was not going to move me into the investigations department, and it had become obvious at that point.

Id. at p. 29 (deposition pp. 110, lines 24-25 and 111, lines 1-11) (emphasis added).

None of the other evidence submitted by Farmer in opposition to defendant's motion, including Mouton's deposition testimony, Record Doc. No. 49-3, contains any indication that

Mouton and the Board exhibited racial animus toward plaintiff when she was not promoted or allegedly harassed.

None of this "evidence" is sufficient to create a triable issue that any "harassment" by defendants was race-based or that it constituted circumstances so severe, pervasive or adversely affective of her employment status as to support judgment in plaintiff's favor for hostile work environment, constructive discharge or retaliation. As discussed above, Farmer was "overlooked" for promotions because she was not deemed qualified by Civil Service per its requirements, not because of her race. Mouton's alleged agitation, aggravation and even discouragement when Farmer allegedly tried to talk to her about positions for which she was not Civil Service qualified is not evidence sufficient to establish harassment based on race. Conclusory statements of "racial tension" and speculation that she was "black-balled" in her efforts to seek employment with law firms, all with no specific facts to support such conclusions, do not give rise to a triable fact issue. As discussed below, the alleged "ransacking" of Farmer's workspace and computer was the result of her use of those items to conduct unauthorized work for a private paralegal service and was not based on her race. In short, plaintiff's evidence is so weak, conclusory and tenuous as to essential elements of her Title VII claims on which she bears the burden of proof at trial that it could not support a judgment in her favor as a matter of law.

(i)     Hostile Work Environment Claim

Plaintiff asserts that she was harassed on the basis of her race to the point that her conditions of employment were altered, a hostile working environment was created and defendants knew or should have known of the harassment, but failed to take prompt remedial

action.  Record Doc. Nos. 1 at ¶ 16 and 49 at p. 18.  She further alleges that Mouton harbored

negative feelings toward the Board's African American employees and that defendants harassed

her personally by "ransack[ing]" her office, "invad[ing]" her computer and making her "clean[]

toilets, deliver[] packages and sweep[] stairs."  Record Doc. No. 49 at pp. 18-19.  Defendants

respond that "Farmer was not subjected to any acts of harassment which affected a term,

condition, or privilege of her employment."  Record Doc. No. 42-1 at p. 18.

> To establish a race-based hostile working environment claim, plaintiff must show that she
>
> (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was <u>based on race</u>; (4) the harassment complained of <u>affected a term, condition or privilege</u> of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

<u>Minnis v. Bd. of Supervisors</u>, 620 F. App'x 215, 220-21 (5th Cir. 2015) (quotation omitted)

(citing <u>Hernandez v. Yellow Transp., Inc.</u>, 670 F.3d 644, 651 (5th Cir. 2012)) (emphasis added).

"If the claim is that the supervisor harassed the employee, the plaintiff need not satisfy the fifth

element."  <u>Caldwell v. Lozano</u>, 689 F. App'x 315, 322 (5th Cir. 2017) (citing <u>Watts v. Kroger

Co.</u>, 170 F.3d 505, 509 (5th Cir. 1999)).  As previously stated, plaintiff's mere subjective belief

that she was subjected to race-based harassment is not competent summary judgment evidence

and cannot be the basis of relief.  <u>Cavalier v. Clearlake Rehab. Hosp., Inc.</u>, 306 F. App'x 104,

107 (5th Cir. 2009) ("Though [the plaintiff] may believe that all [of the] incidents were

motivated by racial animus, subjective belief of racial motivation, without more, is not sufficient

to show a hostile work environment.").

Farmer has not produced evidence sufficient to support the second, third or fourth elements of her hostile work environment.  As to the second element, she has no competent evidence that <u>any</u> harassment occurred apart from the aforementioned stray remark by Knecht, which is discussed in greater detail below, during her reported discussion with Mouton about the Madere promotion.  <u>See</u> Record Doc. No. 49-1 at p. 12 (deposition pp. 44, lines 17-25 and 45, lines 1-25) (Knecht and Mouton discussed how a single black mother could have done so well at Tulane and Knecht suggested that Farmer "must have cheated").  The evidence shows that her computer was searched and her computer usage was monitored only after defendants learned that Farmer was using Board equipment to perform outside paralegal work for another employer during her working hours at the Board.  As Mouton testified, the Board had proof that Farmer was performing unauthorized paralegal work for a private business and Mouton asked Farmer's supervisor to "counsel [Farmer] that that was inappropriate use of the Board's resources." Record Doc. No. 42-4 at p. 5.  The evidence also shows that plaintiff did not regularly perform the delivery and/or janitorial duties that were an added part of her job.  Record Doc. No. 49-1 at p. 19 (deposition p. 70, lines 17-19).

A supervisor's temporary changes to schedule and duty assignments and careful monitoring of the employee's job performance, absent any other evidence of prohibited discrimination, do not support a hostile work environment claim.  <u>Hiner v. McHugh</u>, 546 F. App'x 401, 407 (5th Cir. 2013); <u>Ellis v. Principi</u>, 246 F. App'x 867, 871 (5th Cir. 2007); <u>Bryan v. Chertoff</u>, 217 F. App'x 289, 294 (5th Cir. 2007); <u>Escalante v. Holder</u>, No. EP-09-CV-368-KC,

2011 WL 1528472, at *8 (W.D. Tex. Apr. 20, 2011) (citing Ellis, 246 F. App'x at 871-72; McConathy v. Dr. Pepper/Seven-Up Corp., 131 F.3d 558, 563-64 (5th Cir. 1998)).

Farmer has not produced sufficient evidence that the alleged harassment was based on her race. "A hostile work environment claim . . . necessarily rests on an allegation that an employer has created a working environment heavily charged with . . . discrimination." Raj v. La. State Univ., 714 F.3d 322, 330-31 (5th Cir. 2013) (quotation omitted). To connect defendants' actions to her race, Farmer relies in part on the fact that Mouton is white, as were the three women who were hired as compliance investigators. A mere difference in race, "[w]ithout more, . . . does not support a finding that [plaintiff] suffered race . . . -based harassment." Byrnes v. City of Hattiesburg, 662 F. App'x 288, 290-91 (5th Cir. 2016) (citing Hernandez, 670 F.3d at 652). Farmer did not complain to Mouton or the Board of a racially hostile work environment, Record Doc. No. 49-1 at p. 17 (deposition p. 64, line 17). The lack of "facts that link the alleged harassment with [her] race" means that she cannot establish a racially hostile work environment. Raj, 714 F.3d at 331; accord Byrnes, 662 F. App'x at 291; Minnis, 620 F. App'x at 221; Hernandez, 670 F.3d at 651; Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002).

Finally, Farmer cannot show that the conduct of which she complains affected a term, condition or privilege of employment.

> For harassment to affect a term, condition or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." To determine whether harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment, this Court considers a number of factors: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or

humiliating (or whether it is a mere offensive utterance), and whether it unreasonably interferes with the victim's work performance."

Buisson v. Bd. of Supervisors, 592 F. App'x 237, 245 (5th Cir. 2014) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Farmer has produced evidence of possible race-based harassment in the aforementioned stray remark made by Knecht during her discussion with Mouton. Binding Fifth Circuit precedent establishes however, that evidence of one stray remark does not establish harassment that was so severe or pervasive that it altered the conditions of Farmer's employment. Knecht's remark and discussion with Mouton, while offensive and annoying, is not evidence sufficient to sustain an actionable claim of race-based hostile work environment. Buisson v. Bd. of Sup'rs of La. Cmty. and Tech. College Sys., 592 F. App'x 237, 245 (5 Cir. 2014) (citing Lauderdale v. Tex. Dep't of Criminal Justice, 512 F.3d 157, 163 (5th Cir. 2007)) ("Title VII . . . is not a 'general civilty code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges in the 'terms and conditions of employment.'") (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))).

> [This incident does] not rise to the level of severity or pervasiveness required to support a hostile-work-environment claim. [It did not involve] physically threatening or humiliating conduct, as opposed to offensive utterances. And, [Knecht's] bigoted [comment] was isolated. Its utterance indicates [Knecht's] discriminatory intent; however, its one-time utterance is insufficient–even when combined with [Knecht's] other behavior–to create a [race-based], hostile work environment."

Id.

In addition, an internal investigation of Farmer's conduct concerning her improper use of Board time and equipment to conduct private business is not sufficiently severe to alter a term,

condition or privilege of employment. <u>McGarry v. Univ. of Miss. Med. Ctr.</u>, 355 F. App'x 853, 858 (5th Cir. 2009) (citing <u>Shepherd v. Comptroller of Pub. Accounts</u>, 168 F.3d 871, 872-74 (5th Cir. 1999)). Farmer has not produced any evidence that any of the alleged conduct was so frequent, severe, physically threatening or humiliating to interfere unreasonably with her work performance. "Based on the totality of the circumstances, the combination of alleged acts does not constitute a hostile work environment because [plaintiff] has not shown that the acts were 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" <u>Minnis</u>, 620 F. App'x at 221.

Plaintiff has not "come forward with more than speculation of unlawful harassment to survive summary judgment." <u>Byrnes</u>, 662 F. App'x at 291 (citing <u>Ramsey</u>, 286 F.3d at 269). Accordingly, defendants are entitled to summary judgment in their favor as a matter of law on Farmer's hostile work environment claim.

(ii)    <u>Constructive Discharge Claim</u>

Farmer contends that Mouton and the Board created a working environment so hostile to her that she was constructively discharged. Record Doc. No. 1 at ¶ 16. Defendants argue that Farmer cannot establish constructive discharge because she suffered no adverse employment action and resigned voluntarily. Record Doc. No. 42-1 at pp. 15-16.

Plaintiff contends that she resigned because she was repeatedly denied promotions and felt she was not "being utilized to [her] full capabilities" as a licensing analyst. Record Doc. No. 49-1 at p. 14 (deposition p. 53, lines 11-18). A resignation can be an adverse employment action "only if the resignation qualifies as a constructive discharge." <u>Brown v. Kinney Shoe Corp.</u>, 237

F.3d 556, 566 (5th Cir. 2001). "'To prove a constructive discharge, a plaintiff must establish that working conditions were <u>so intolerable that a reasonable employee</u> would feel compelled to resign.'" <u>Brown v. Liberty Mut. Grp., Inc.</u>, 616 F. App'x 654, 657 (5th Cir. 2015) (quoting <u>Brown</u>, 237 F.3d at 566) (emphasis added). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." <u>Brown</u>, 237 F.3d at 566 (citations omitted). Similarly, to establish constructive discharge based on a hostile work environment, Farmer "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." <u>Noack v. YMCA of Greater Houston Area</u>, 418 F. App'x 347, 352 (5th Cir. 2011) (citing <u>Stover v. Hattiesburg Pub. Sch. Dist.</u>, 549 F.3d 985, 991 (5th Cir. 2008)).

In determining whether a reasonable employee would feel compelled to resign, we have considered the relevancy of the following events:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

<u>Brown</u>, 237 F.3d at 566 (quotation and citations omitted).

Plaintiff alleges that she was given additional job duties in July 2014, including unloading trucks, delivering packages and performing some of the Board's janitorial and/or maintenance duties. Record Doc. Nos. 49-6 at p.4 and 49-11 at ¶ 66. Plaintiff does not allege that these additional job duties were a reassignment. Farmer testified that she did not have enough work

to do, and that she did not regularly perform additional delivery and janitorial services for the Board.  Record Doc. No. 49-1 at pp. 18-19 (deposition pp. 69-70).

Farmer has <u>not</u> proved that any of the factors necessary to demonstrate constructive discharge are present.  The Board did not demote her, reduce her salary or her job responsibilities; reassign her permanently to menial or degrading work or to work under a younger supervisor; badger, harass or humiliate her; or offer early retirement.  On the contrary, plaintiff was given additional job duties before she resigned because she admittedly did not have enough work to keep her busy.  These facts, without more, are insufficient for a finding that a reasonable employee in Farmer's position would have felt compelled to resign.  Farmer, therefore, has not met her burden of creating a material fact issue that she suffered an adverse employment action, intolerable work conditions or harassment so severe or pervasive as to result in constructive discharge.

Accordingly, defendants' motion for summary judgment on plaintiff's constructive discharge claim is GRANTED.

(iii)    <u>Retaliation Claim</u>

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53, 58 (2006) (quoting 42 U.S.C. § 2000e-3(a)); <u>accord</u> <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 561 n.28 (5th Cir. 2007).

To prove retaliation, plaintiff bears the initial burden to produce evidence

(1) that [she] participated in an activity protected by Title VII, (2) that [her] employer took an adverse employment action against [her], and (3) that there is a causal connection between the adverse employment action and the protected activity. This establishes the employee's prima facie case, and gives rise to an inference of retaliation. The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to demonstrate that the employer's [stated] reason is actually a pretext for retaliation. In order to demonstrate pretext sufficient to defeat a motion for summary judgment, an employee must produce evidence that could lead a reasonable fact-finder to conclude that the adverse [employment] action would not have occurred "but for" the employee's decision to engage in an activity protected by Title VII.

Alkhawaldeh v. Dow Chem. Co., 851 F.3d 422, 427 (5th Cir. 2017) (quotations and citations omitted). Farmer cannot establish retaliation because there is no evidence that defendants took an adverse employment action against her causally connected to any protected activity.

As to the first element, Farmer's testimony indicates that she engaged in activity protected by Title VII before her resignation but that defendants did not receive notice of the protected activity. Farmer claims that defendants retaliated against her for mentioning alleged racial discrimination and harassment to her supervisors. Record Doc. Nos. 49 at p. 9 and 49-1 at p. 17 (deposition p. 63, lines 18- 21). While "'an informal complaint may constitute protected activity for purposes of retaliation claims,'" Amanduron v. Am. Airlines, 416 F. App'x 421, 424 (5th Cir. 2011) (quoting Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2009)) (citing Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 626 (5th Cir. 2008); Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002)), Farmer did not complain "that [she] had been disciplined [or not promoted] in a discriminatory manner based upon [her] race . . . and [did not] request that an investigation of [her] complaint be conducted." Amanduron, 416 F. App'x at 424.

Defendants were not copied on the letter Farmer sent to the EEOC on July 9, 2014, only nine (9) days before she voluntarily resigned to take another job that she had already begun, and therefore had no notice that Farmer had engaged in a protected activity. See Ward v. Jackson State Univ., 602 F. App'x 1000, 1002-03 (5th Cir. 2015) (citing Hernandez, 670 F.3d 644, 657 (5th Cir. 2012)) (quoting Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385-86 (5th Cir. 2003)) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."); see also Williams v. Cardinal Health 200, LLC, 948 F.Supp.2d 652, 658 (E.D. La. 2013) (when defendant was not put on notice of charges after plaintiff completed EEOC intake questionnaire, questionnaire could not constitute a charge). Plaintiff's testimony that Knecht and Mouton had received her EEOC letter by July 14, 2014, Record Doc. No. 49-1 at p. 24 (deposition p. 93, lines 1-11), is inadmissible because it is not based on her personal knowledge, but on a "common-knowledge" allegation that "everybody in the office knew" that Mouton had received the letter. Fed. R. Evid. 602. Even if Mouton did receive the letter on July 14, plaintiff had already accepted another job and resigned only four days later, at a time when no retaliatory adverse employment action had been taken. Plaintiff's formal charge of discrimination and retaliation was not filed with the EEOC until after she resigned, at which time the Board first received notice of her allegations.

As to the second and third elements, as previously discussed above in relation to plaintiff's constructive discharge claim, plaintiff has not met her burden of creating a material fact issue that she suffered an adverse employment action when she resigned. Brown v. Liberty

Mut. Grp., Inc., 616 F. App'x at 657; Brown, 237 F.3d at 566. The evidence in the record is insufficient for a finding that a reasonable employee in Farmer's position would have felt compelled to resign, and, as such, plaintiff cannot establish that she suffered any adverse employment action, including constructive discharge. Id. In the absence of an adverse employment action, Farmer cannot establish a case of retaliation.

Defendants are entitled to summary judgment in their favor on Farmer's retaliation claim.

D.      Plaintiff's Section 1983 Claims Are Time-Barred

Farmer's 1983 claims have prescribed. State tort law defines the "contours and prerequisites of a § 1983 claim." Manuel v. City of Joliet, 137 S. Ct. 911, 920 (2017) (citing Carey v. Piphus, 435 U.S. 247, 257-258 (1978)). "For 1983 cases brought in Louisiana federal courts, the appropriate statute of limitations is one year." Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 604 (5th Cir. 1988); La. Civ. Code art. 3536. "[A]ccrual of a section 1983 claim, which determines when the statute of limitations begins to run, is governed by federal common law. . . ." Heath v. Bd. of Supervisors, 850 F.3d 731, 737 (5th Cir. 2017). "Under federal law, a cause of action accrues the moment the plaintiff knows or has reason to know of the injury." Smith v. Reg'l Transit Auth., 827 F.3d 412, 421 (5th Cir. 2016) (citing Gartrell v. Gaylor, 981 F.2d 254, 256 (5th Cir. 1993)).

Farmer submitted her resignation letter to the Board on July 18, 2014. Record Doc. Nos. 1 at ¶ 11 and 42-14 at ¶ 28. She filed the instant lawsuit on November 17, 2016. Record Doc. No. 1. She does not allege that any acts of discrimination or retaliation occurred after her resignation. Defendants rely on the termination of Farmer's employment on July 25, 2014, for

their prescription argument. Defendants assert that the last day that Farmer could have been "subjected to any acts creating a hostile work environment was July 25, 2014," and that plaintiff's Section 1983 claims prescribed within one year of her last day of work. Record Doc. No. 42-1 at p. 19.

Farmer's submission of a letter to the EEOC on July 9, 2014 and subsequent filing of an EEOC charge in August 2014, Record Doc. No. 42-13, did <u>not</u> interrupt or suspend the running of prescription on her Section 1983 claims. "It is . . . well settled that the fact that an individual filed a charge of discrimination with the EEOC, even if within the period allowed by the statute of limitations for the filing of such charges, does not toll the statute as it applies to claims arising under 42 U.S.C. § 1981 or § 1983." <u>Williams v. S. Cent. Bell Tel. Co.</u>, No. 86-4493, 1987 WL 18816, at *2 (E.D. La. Oct. 20, 1987) (citing <u>Johnson v. Ry. Express Agency, Inc.</u>, 421 U.S. 454, 465–66 (1975)); <u>Taylor v. Bunge Corp.</u>, 775 F.2d 617, 618-19 (5th Cir. 1985).

Plaintiff's claims under 42 U.S.C. § 1983 regarding acts that occurred one year or more before she filed this lawsuit on November 17, 2016, are therefore prescribed. Accordingly, defendants' motion is GRANTED as to plaintiff's claims against Mouton in her individual and official capacities under 42 U.S.C. § 1983, which are dismissed with prejudice as <u>prescribed</u>.

<u>CONCLUSION</u>

For all of the foregoing reasons, IT IS ORDERED that defendants' motion for summary judgment is GRANTED in that plaintiff's evidence is insufficient to bear her burdens of proof as a matter of law as to her racial discrimination, hostile work environment, constructive discharge and retaliation claims under Title VII and her Section 1983 claims are time-barred.

Plaintiff's claims therefore must be DISMISSED WITH PREJUDICE.  Judgment will be entered separately, plaintiff to bear all costs of this proceeding.  Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this ____28th____ day of ____February____, 2018.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE